UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
ISABELLE BICHINDARITZ,            )      No. C10-1371RSL
                                  )
                   Plaintiff,     )
          v.                      )      MEMORANDUM OF DECISION
                                  )
UNIVERSITY OF WASHINGTON,         )
                                  )
                   Defendant.     )
_____)

This matter was heard by the Court in a bench trial commencing on April 9, 2012, and concluding on April 16, 2012. Dr. Isabelle Bichindaritz, an assistant professor in the Institute of Technology at the University of Washington Tacoma, brought this action alleging that the University violated Title VII of the Civil Rights Act by discriminating against her on the basis of sex and retaliating against her for a complaint she filed with the University Ombudsman. Plaintiff seeks reinstatement and an award of tenure in this litigation.

## FINDINGS OF FACT

By a preponderance of the evidence, the Court finds as follows:

In 2002, Dr. Bichindaritz joined the Institute of Technology in a tenure track position. At the time, all of the tenured professors in the Institute were male. During the first few years of her employment at the Institute, all parties were hopeful – even optimistic – that Dr. Bichindaritz would successfully navigate the tenure process, but she had a tendency to personalize workplace difficulties, setbacks, and frustrations. For example, she felt humiliated when a student chose to work with another professor on a bioinformatics research project, she

MEMORANDUM OF DECISION

felt threatened when colleagues initiated projects within her perceived areas of expertise, she reacted angrily when she was not given the credit for a department function that she thought was her due, and she suspected unfairness when she did not receive grants for which she had applied. Her responses to these adversities rarely involved direct communication with the alleged transgressor. Rather, Dr. Bichindaritz demanded that the Director of the Institute intervene on her behalf to fix the perceived problem and/or withdrew from activities in which she did not feel properly supported or appreciated. Any encroachment on her "turf," whether in terms of research topics, students, course selections, or departmental resources, could trigger a complaint or accusation. As a result, Dr. Bichindaritz managed to alienate people who were otherwise inclined to be her friends and allies (see Trial Ex. 544) and her intra-department relationships were often riddled with conflict. This situation was reflected in her evaluations and annual assessments starting as early as 2004.

Plaintiff's teaching abilities and commitment to teaching were also called into question within a few years of her arrival at the Institute. Student evaluations of plaintiff's teaching varied over time, including periods of marked decline. Dr. Bichindaritz seemed satisfied to externalize the causes of her poor student evaluations. Although a number of faculty members offered to observe Dr. Bichindaritz' teaching and/or provided advice on how to improve effectiveness and evaluations, she rebuffed most offers of assistance and proved resistant to constructive criticism. Virtually every assessment of her teaching since 2004 was neutral or negative and yet plaintiff did not document changes in her technique or approach. Instead, Dr. Bichindaritz opted to change mentors: she cycled through four faculty mentors during her time at the Institute.

Despite having been told that it was vitally important that she improve her intra-department relationships and develop a clear plan to improve as a teacher, plaintiff chose to initiate an early tenure review during the 2005-2006 academic year. The first three levels of review resulted in reports that questioned plaintiff's teaching effectiveness and recommended

MEMORANDUM OF DECISION                -2-

that her tenure application be postponed. The Director of the Institute of Technology, Dr. Orlando Baiocchi, provided the third level of review and concluded that "[t]he candidate presents an outstanding case for tenure and promotion from the perspective [of] research and a strong one from the perspective of service," but that "she has not yet established a sufficient case from the perspective of teaching to warrant overall recommendation for promotion and tenure at this time." Trial Ex. 154. The application went no further.

In October 2006, plaintiff triggered the University's alternative dispute mechanism to resolve a conflict between herself and Dr. Baiocchi. The exact nature of plaintiff's complaint is unknown: witnesses were not permitted to discuss the details of the mediation at trial because of a promise of confidentiality surrounding the process. The Court has assumed, for purposes of this action, that the complaint constitutes protected activity under Title VII. It is undisputed that Dr. Baiocchi knew of the October 2006 request for mediation when plaintiff's mandatory tenure review occurred in 2007-2008. Dr. Baiocchi credibly testified that he harbored no ill will towards Dr. Bichindaritz arising from the mediation because he viewed the process as a right of employment at the University.

The University of Washington's tenure process involves a number of different levels of review which generate at least four written recommendations regarding the award of tenure. When plaintiff applied for tenure in 2007-2008, Dr. Baiocchi once again declined to support her. His November 2007 evaluation summarizes criticisms that had been leveled against Dr. Bichindaritz in the past, bluntly rebuts statements Dr. Bichindaritz made during the tenure review process, takes aim at her perceived lack of collegiality, and generally reveals a growing level of frustration with the candidate. Having heard the evidence at trial, the Court finds that this frustration was the result of long-standing, non-discriminatory tensions between Dr. Baiocchi and Dr. Bichindaritz, his concerns that Dr. Bichindaritz demanded too much, gave too little, and rejected any criticism, and his belief that plaintiff's accounts of herself and her interactions with others were inaccurate and misleading.

MEMORANDUM OF DECISION              -3-

Ultimately the tenure file, including materials chosen by the candidate and the written recommendations, was forwarded to the University Provost, Phyllis M. Wise, for the final decision. In 2007-2008, Provost Wise was presented with a file that contained recommendations both in favor and against tenure for Dr. Bichindaritz. The initial review committee and the Vice Chancellor for Academic Affairs, Dr. Beth Rushing, recommended tenure for plaintiff. The voting faculty committee and the Program Director (Dr. Baiocchi) voted against tenure. Where, as in this case, there is disagreement amongst or within the reviewing bodies, Provost Wise and those in her chain of command would carefully go through the file and spend as much time as necessary to ensure that the Provost was comfortable with the decision. Provost Wise recognized that the decision to grant or deny tenure is not only important for the individual faculty member, but also for the institution. A mixed vote in the tenure file always prompted careful consideration.[1]

In 2007-2008, Provost Wise reviewed plaintiff's tenure file and conferred with the Vice Provost of Academic Personnel, Dr. Cheryl Cameron, Dr. Rushing, and the Chancellor of the University of Washington at Tacoma campus, Dr. Patricia Spakes. Dr. Rushing and Dr. Spakes expressed some concern regarding gender balance in the Institute of Technology and wanted to make sure that Dr. Bichindaritz had every opportunity to improve her teaching and address the collegiality issues that had been raised. Provost Wise ultimately determined that a decision regarding Dr. Bichindaritz' tenure application should be postponed for a year. No one piece of information was particularly helpful or controlling: had Dr. Baiocchi voted in favor of an award of tenure, it would not have made a difference because there was already a split

---

[1] Such caution is eminently reasonable since, as was the case here, a split vote may suggest that the candidate is borderline and that the reviewers, regardless of their ultimate vote, have concerns or doubts. A number of individuals who supported Dr. Bichindaritz for tenure and promotion did so with significant reservations. Dr. Josh Tenenberg, for example, testified that it was a close call and "a very, very difficult decision" to support her application. Dr. Steven Hanks had concerns about Dr. Bichindaritz' teaching and collegiality and considered it "risky" to recommend her for tenure. Dr. Rushing was unsure about the applicant's merits, but gave her the benefit of the doubt in 2007-2008.

MEMORANDUM OF DECISION                -4-

between the voting faculty committee and Dr. Rushing.  Provost Wise determined, and Dr. Bichindaritz was informed, that a decision on the application would be postponed because of:

- Concerns regarding teaching effectiveness as reflected in a pattern of low student and peer evaluations.
- Concerns regarding her collegiality and the untoward effect on the Institute's teaching, research and service activities.
- A need for clarity with regard to the significance of her scholarly achievements and as to which publications are primary literature in peer-reviewed journals.

Trial Ex. 579.

Dr. Rushing's and Dr. Spakes' concern that the Institute may not have provided Dr. Bichindaritz with the assistance, advice, and/or opportunities necessary to generate an acceptable tenure application was not based on any particular evidence or a complaint raised by or associated with Dr. Bichindaritz.  Rather, both Dr. Rushing and Dr. Spakes had, at the time of this tenure review, been in academia long enough to develop a sensitivity to gender issues and were concerned about this possibility as a general matter.

Following the postponement of Dr. Bichindaritz' 2007-2008 tenure application, a number of her colleagues, including Dr. Rushing, Dr. Tenenberg, Dr. George Mobus, Dr. Baiocchi, and Dr. Moshe Rosenfeld, attempted to help plaintiff overcome the three deficits identified by Provost Wise.  Most of these individuals found Dr. Bichindaritz hard to work with and felt that their efforts to assist her were rebuffed.  To many within and without the department, Dr. Bichindaritz appeared unwilling to acknowledge that there was anything wrong with her teaching[2] or that collegiality should be a factor in the tenure analysis.

---

[2] Dr. Bichindaritz' reaction stands in marked contrast to that of Dr. Samuel Chung.  Neither candidate thought that his or her teaching was lacking.  Dr. Chung, however, recognized that if he hoped to be awarded tenure in the next review period, he had to accept the assessment, work with his mentor, and take concrete steps designed to generate a measurable increase in teaching effectiveness.  Dr. Bichindaritz, on the other hand, challenged the accuracy of the student and peer assessments she received, blamed the negative evaluations on external and/or temporary causes, and failed to pursue enrichment programs or other options that might have improved her teaching effectiveness.  As Dr.

MEMORANDUM OF DECISION                -5-

During the 2008-2009 academic year, both the initial review committee and the senior faculty committee voted in favor of granting plaintiff tenure, by votes of 4-0 and 4-3 respectively. Dr. Baiocchi, however, felt that the concerns identified by Provost Wise had not been "properly addressed by the candidate and certainly [had not been] resolved." Trial Ex. 145. He recommended that tenure be denied. The University of Washington Tacoma Faculty Council then completed its own review of plaintiff's tenure file and voted unanimously in favor of granting tenure, specifically rebutting some of Dr. Baiocchi's criticisms by interpreting the same data differently.

In March 2009, Dr. Rushing performed a thorough and independent review of plaintiff's tenure file in order to evaluate Dr. Bichindaritz' scholarship, teaching, and service contributions. Although she reviewed Dr. Baiocchi's recommendation and evaluations along with the rest of the file, she conducted an in-depth analysis of the file, considering factors and drawing conclusions *de novo*. Dr. Rushing was, at the time, coming to the conclusion that Dr. Baiocchi was not a particularly good director/manager of the Institute and was therefore not swayed by his opinions in this matter. In fact, had Dr. Baiocchi recommended tenure in 2008-2009, Dr. Rushing would have disagreed because Dr. Bichindaritz had not addressed the three concerns identified by Provost Wise the year before. In particular, Dr. Rushing was looking for (a) some indication that Dr. Bichindaritz had internalized the critiques of her teaching, (b) evidence that Dr. Bichindaritz had used the feedback she received to make modifications to her teaching methods, and (c) increases in student evaluations. A review of the file, with special focus on the *curriculum vitae*, the candidate's narrative, and the teaching portfolio materials, did not reveal the necessary evidence. Whereas Dr. Rushing had voted in favor of tenure in 2007-2008, she voted against tenure in 2008-2009.

---

Spakes testified, the University of Washington Tacoma did not demand that a tenure candidate be a stellar instructor right out of the box, but it certainly expected candidates to recognize the importance of teaching and to take steps to remedy deficiencies.

MEMORANDUM OF DECISION             -6-

Dr. Rushing's and Dr. Spakes' previous concern that Dr. Bichindaritz may have been held back by a lack of support at the Institute had been allayed. Prompted by comments made during exit interviews between 2005 and 2008, Dr. Rushing had conducted an investigation of the Institute which failed to reveal any evidence that the personnel problems reported reflected a gender bias (as opposed to a staff/faculty bias). In addition, Dr. Rushing had attempted to help Dr. Bichindaritz improve her *curriculum vitae* after the initial postponement decision. Despite the existence of what should have been a shared goal, Dr. Rushing came to the conclusion that it was difficult to help Dr. Bichindaritz improve in the absence of an acknowledgment that improvement was necessary. As a result, neither Dr. Spakes nor Dr. Rushing had any concerns this go around regarding the effect that institutional factors may have had on plaintiff's tenure application. There is no evidence that Dr. Rushing changed her vote as a result of pressure from above (Provost Wise) or undue influence from below (Dr. Baiocchi).

Provost Wise was again presented with a tenure file that contained mixed recommendations. After conferencing with Dr. Cameron, Provost Wise determined that Dr. Bichindaritz had failed to show improvement in the three areas of concern identified the year before. Once again, Dr. Baiocchi's recommendation was not dispositive: the mixed recommendations triggered an in-depth review of the tenure file that informed the ultimate decision.

Contrary to plaintiff's arguments in closing, the importance of teaching excellence and collegiality in the tenure and promotion process were not *post hoc* litigation justifications for the rejection of plaintiff's application. Both Provost Wise and Dr. Cameron testified that a professor's teaching abilities were more important at the University's satellite campuses, such as University of Washington Tacoma, than on the main campus in Seattle because the programs were newer and the professors had higher teaching loads. Collegiality on the satellite campuses was also essential as small groups of instructors were tasked with working together to build new programs. If plaintiff did not understand that teaching excellence and collegiality were expected

MEMORANDUM OF DECISION              -7-

of tenured professors in the Institute, it was not because she had not been told but rather because she refused to listen.

## CONCLUSIONS OF LAW

### A. DISCRIMINATION

Based on the foregoing facts, the Court concludes that Dr. Bichindaritz' sex was not a motivating factor behind Dr. Baiocchi's recommendations against tenure or Provost Wise's decisions to postpone and ultimately deny tenure. Costa v. Desert Palace, Inc., 299 F.3d 838, 848 (9th Cir. 2002).[3] While it may be true that Dr. Baiocchi did not particularly like Dr. Bichindaritz as a colleague, any such animosity was not on account of her gender. Even had plaintiff proved that Dr. Baiocchi harbored some discriminatory animus against Dr. Bichindaritz – which the Court expressly finds was not the case – his recommendations were not a causal factor of the denial of tenure. Staub v. Proctor Hosp., __ U.S. __, 131 S. Ct. 1186, 1191-93 (2011).

### B. RETALIATION

The Court concludes that Dr. Bichindaritz' invocation of the mediation process before the University Ombudsman was not a motivating factor behind Dr. Baiocchi's recommendations against tenure or Provost Wise's decisions to postpone and ultimately deny

---

[3] Because defendant succeeded in carrying its burden of producing evidence of a legitimate, non-discriminatory reason for the denial of tenure, the Court "proceeds to decide the ultimate question: whether plaintiff has proven 'that the defendant intentionally discriminated against [plaintiff] because of [her gender].'" St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). Plaintiff's evidence regarding the awards of tenure to Dr. Chung and Dr. Donald Chinn, while marginally relevant to this ultimate issue, was not persuasive. Title VII does not require that the candidate whom the Court considers most qualified be awarded the position: it simply requires that the decision be based on characteristics other than those specified in the statute. A decision whether to grant tenure rests on a complex, multi-tiered, nuanced analysis of the candidate conducted by individuals with far greater familiarity with both the university and the area of study than the undersigned. Absent some indication that the decision was tainted by gender bias or a showing that the tenure and promotion decisions lacked any rational basis except gender bias, the Court declines plaintiff's invitation "to engage in a tired-eye scrutiny of the files of successful male candidates for tenure in an effort to second-guess the numerous scholars at the University of [Washington] who had scrutinized Dr. [Bichindaritz'] qualifications and found them wanting." Lieberman v. Gant, 630 F.2d 60, 68 (2nd Cir. 1980).

tenure. Plaintiff has not shown by a preponderance of the evidence that there was a causal link between the assumed protected activity and the adverse employment action. Freitag v. Ayers, 468 F.3d 528, 541 (9th Cir. 2006). Even had plaintiff proved that Dr. Baiocchi harbored some retaliatory animus against Dr. Bichindaritz – which the Court expressly finds was not the case – his recommendations were not a causal factor of Provost Wise's decision.

For all of the foregoing reasons, the Clerk of Court is directed to enter judgment in favor of defendant and against plaintiff.

Dated this 20th day of April, 2012.

*[signature]*

Robert S. Lasnik
United States District Judge